NO.:_____

G. J. No. ES-03-062

**49C**

*CC-03-0121*

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this *4* day of *MARCH* , 2003.

_James E. Dunbar_
**Grand Jury Foreman**

_Daniel Shuy_
**Clerk of the Circuit Court**
**of Barbour County**
**Third Judicial Circuit**

*3-5-03*
**Date**

# INDICTMENT

## THE STATE OF ALABAMA

*vs.*

*MARCUS ANTWAN RUSSAW*

### Address: P.O. BOX 847/ HWY 51, CLAYTON, AL 36016

*alias*

**None Reported**

**CHARGES:**

1. BURGLARY FIRST DEGREE-PHYSICAL INJURY     CLASS: A     TYPE: F

**WITNESSES:**

ELMER "ELMIRA" JACKSON, 82 E COLLEGE ST, CLAYTON, AL  36016
ASST. CHIEF RICHARD PETERSON, CLAYTON POLICE DEPARTMENT, CLAYTON, AL  36016
CHIEF JAMEY WILLIAMS, CLAYTON POLICE DEPARTMENT, CLAYTON, AL  36016

Previous Bond $ _____ Bail fixed at $ **No Bond** this **5th** day of **March** , 2003.

_Bert Shatack_
**Judge Presiding**

| | |
|---|---|
| **THE STATE OF ALABAMA**<br>**Barbour COUNTY** | **CIRCUIT COURT**<br>2003 |

**BOYD WHIGHAM**
**DISTRICT ATTORNEY**
**THIRD JUDICIAL CIRCUIT**

NO. :_____

G. J. No. ES-03-062

*50C*

THE STATE OF ALABAMA, Barbour COUNTY

Circuit Court - Third Judical Circuit

## COUNT 1

The Grand Jury of said county charge that, before the finding of this indictment, MARCUS ANTWAN RUSSAW, whose name is otherwise unknown to the Grand Jury, did on or about October 4, 2001, knowingly and unlawfully enter or remain unlawfully in a dwelling of ELMER "ELMIRA" JACKSON, with intent to commit a crime therein to-wit:Theft of property, and while effecting entry or while in the dwelling or in immediate flight therefrom, said defendant did cause physical injury to ELMER "ELMIRA" JACKSON, by beating her about her face and body, in violation of Section 13A-7-5 of the Code of Alabama,

against the peace and dignity of the State of Alabama

BOYD WHIGHAM
District Attorney
Third Judicial Circuit

BEN C. REEVES, JR.
Chief Asst. District Atty.

*Plea AC-03-8142*

NO.:_____

G. J. No. ES-03-063

**3C**

*CA 03-0128*

A TRUE BILL, presented to the judge Presiding in open Court by the Foreperson of this Grand Jury, and filed in open court this 4 day of *MARCH*, 2003.

_____
**Grand Jury Foreman**

_____
**Clerk of the Circuit Court**
**of Barbour County**
**Third Judicial Circuit**

*3-5-03*
_____
Date

## INDICTMENT

### THE STATE OF ALABAMA

*vs.*

### MARCUS ANTWAN RUSSAW

*Address: P.O. BOX 847/ HWY 51, CLAYTON, AL  36016*

### alias

### None Reported

**CHARGES:**

1. ATTEMPT TO COMMIT MURDER    CLASS: A    TYPE: F

**WITNESSES:**
ELMER "ELMIRA" JACKSON, 82 E COLLEGE ST, CLAYTON, AL  36016
ASST. CHIEF RICHARD PETERSON, CLAYTON POLICE DEPARTMENT, CLAYTON, AL  36016
CHIEF JAMEY WILLIAMS, CLAYTON POLICE DEPARTMENT, CLAYTON, AL  36016

Previous Bond $ _____ Bail fixed at $ **No Bond** this **5th** day of **March**, 2003.

_____
**Judge Presiding**

**THE STATE OF ALABAMA**
**Barbour COUNTY**

**CIRCUIT COURT**
2003

**BOYD WHIGHAM**
**DISTRICT ATTORNEY**
**THIRD JUDICIAL CIRCUIT**

State Of Alabama)
Jefferson County)

## AFFIDAVIT OF **MARCUS ANTWAN RUSSAW**

Before, Me, the undersunged Notary Public, for said
State and County , at large, personally appeared **Marcus Antwan
Russaw,** who is known to Me, or other wise unknown, being first
duly sworn and deposes, and says under oath that:

1). My true and legal name is **Marcus Antwan Russaw.**

2). I am over 21 years of age.

3). I have personal knowledge of the facts atested to
within this affidavit.

4). I am willing to testify to the matters of this affidavit
within any court of this state with lawful jurisdiction.

5). I am competent to testify to any and all matters
within this affidavit and Rule 32 Petition.

6). I make this affidavit in support of my Rule 32 Petition
which is due to be filed by August 20, 2005.

7). On the day I got arrested I was placed in the Barbour
County Jail. Thereafter, I was indicted for capital murder.

8). **Attorney Paul W. Brunson, Jr.,** was appointed to
represent me against the capital murder charge as lead counsel.

for DNA in the capital murder pretrial proceeding, and at the time of the filing of the motion they had no knowledge of the Attempted Murder nor Bruglary, because those cases did not exist.

17). If **Attorney Paulr W. Brunson, Jr.,** and **Attorney John Robertson,** had not disclosed confidential information to the District Attorney I wouldn't hove been tried and convicted for Attempted Murder and Bruglary.

18). Had not **Attorney John Robertson,** and **Attorney Paul W. Brunson, Jr.,** disclosed confidential information to the possibility of blood being on my shoes, I would not be in prison with two (2) life sentences.

I, **Marcus Antwan Russaw,** heretofore, states that the information herein is true an correct to the best of my knowledge and belief.

Executed on this ___21___ day of ___July___ 2005.


*Marcus Russaw*
Marcus Antwan Russaw


*[signature]* ___10/20/08___
Notary Public                My Commission Expires


Dated this _21st_ of _July_ 2005.

1           IN THE THIRD JUDICIAL CIRCUIT
       IN AND FOR BARBOUR COUNTY, ALABAMA
2                  CLAYTON DIVISION

3    STATE OF ALABAMA,
           Plaintiff,
4
                          Criminal Action Nos.
5    Vs.                  CC-2003-0120 & CC-2003-0121

6    MARCUS ANTWAN RUSSAW,
           Defendant.
7

8        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
         REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL
9        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10

11       Trial Proceedings taken in the above-styled cause

12   in the Barbour County Courthouse, Clayton, Alabama, on

13   August 5, 2003, and September 11, 2003, before the

14   Honorable Burt Smithart.

15

16                    **APPEARANCES**

17   ON BEHALF OF THE STATE:

18       Boyd Whigham, District Attorney
         Carmella Penn, Assistant District Attorney
19
     ON BEHALF OF THE DEFENDANT:
20
         Paul W. Brunson, Jr., Attorney at Law
21       John Robertson, Attorney at Law

22

23                OFFICIAL COURT REPORTER
                     Kelli W. Mills
24                  408 N. Prairie Street
              Union Springs, Alabama  36089
25                   (334) 738-3284


**COPY**                                    1

1                          INDEX

2   COURT'S OPENING REMARKS . . . . . . . . . . . . . .6
    OPENING STATEMENTS . . . . . . . . . . . . . . .11
3
    WITNESSES CALLED ON BEHALF OF THE STATE:
4
        Margie Lowman
5           DX by Mr. Whigham . . . . . . . . . . . .14
            CX by Mr. Brunson . . . . . . . . . . . .21
6
        Larry Bowick
7           DX by Mr. Whigham . . . . . . . . . . . .23
            CX by Mr. Brunson . . . . . . . . . . . .29
8
        Tommy Scott
9           DX by Mr. Whigham . . . . . . . . . . . .32

10      Lenora Gamble
            DX by Mr.  Whigham . . . . . . . . . . . 35
11
        Jamie Williams
12          DX by Mr. Whigham . . . . . . . . . . . .37
            CX by Mr. Brunson . . . . . . . . . . . .44
13          RD by Mr. Whigham . . . . . . . . . . . .47
            RX by Mr. Brunson . . . . . . . . . . . .47
14          FRD by Mr. Whigham . . . . . . . . . . . 48
            FRX by Mr. Brunson . . . . . . . . . . . 49
15
        Danelle Lamson
16          DX by Mr. Whigham . . . . . . . . . . . .51
            CX by Mr. Brunson . . . . . . . . . . . .52
17
        Richard Peterson
18          DX by Mr. Whigham . . . . . . . . . . . .54
            CX by Mr. Brunson . . . . . . . . . . . .57
19          RD by Mr. Whigham . . . . . . . . . . . 124
            RX by Mr. Brunson . . . . . . . . . . . 126
20          FRD by Mr. Whigham . . . . . . . . . . .128
            FRX by Mr. Brunson . . . . . . . . . . .128
21
        Richard Agerton
22          DX by Mr. Whigham . . . . . . . . . . . .75
            DX (Cont'd) by Mr. Whigham . . . . . . . .118
23          CX by Mr. Brunson . . . . . . . . . . . 119
            RD by Mr. Whigham . . . . . . . . . . . 120
24          RX by Mr. Brunson . . . . . . . . . . . 122
            FRD by Mr. Whigham . . . . . . . . . . .123
25
        Brian Wilson

2

DX by Mr. Whigham . . . . . . . . . . . .82
CX by Mr. Brunson . . . . . . . . . . . .83

Pete Macchia
DX by Mr. Whigham . . . . . . . . . . . .86
VD by Mr. Brunson . . . . . . . . . . . .88
DX (Cont'd) by Mr. Whigham . . . . . . .89
CX by Mr. Brunson . . . . . . . . . . . .99
RD by Mr. Whigham . . . . . . . . . . .108
RX by Mr. Brunson . . . . . . . . . . .109
FRD by Mr. Whigham . . . . . . . . . . .112
FRX by Mr. Brunson . . . . . . . . . . .112

Judy Ketchum
DX by Mr. Whigham . . . . . . . . . . .112
DX (Cont'd) by Mr. Whigham . . . . . . .117

## STATE'S EXHIBITS (Recv'd)

Exhibit 1 . (Medical Records). . . . . . . . . 50
Exhibit 2 . (Medical Records). . . . . . . . . 50
Exhibit 3-A (Photo) . . . . . . . . . . . . .27
Exhibit 4 . (Map) . . . . . . . . . . . 28,55
Exhibit 5 . (Sketch). . . . . . . . . . . . .76
Exhibit 6 . (Photo). . . . . . . . . . . . . 39
Exhibit 7 . (Photo). . . . . . . . . . . . . 39
Exhibit 8 . (Photo). . . . . . . . . . . . . 39
Exhibit 9 . (Photo) . . . . . . . . . . . . .26
Exhibit 10 .(Photo). . . . . . . . . . . . . 39
Exhibit 11 .(Photo). . . . . . . . . . . . . 39
Exhibit 12 .(Photo). . . . . . . . . . . . . 39
Exhibit 13 .(Photo). . . . . . . . . . . . . 39
Exhibit 14 .(Photo). . . . . . . . . . . . . 39
Exhibit 15 .(Photo). . . . . . . . . . . . . 39
Exhibit 16 .(Photo). . . . . . . . . . . . . 39
Exhibit 17 .(Shoes). . . . . . . . . . . . . 80
Exhibit 18 .(Photo). . . . . . . . . . . . . 18
Exhibit 19 .(Photo). . . . . . . . . . . . . 18
Exhibit 20 .(Photo). . . . . . . . . . . . . 18
Exhibit 21 .(Photo). . . . . . . . . . . . . 18
Exhibit 22 .(Cert. Conviction). . . . . . . .117
Exhibit 23 .(Swabs). . . . . . . . . . . . .108

MOTIONS/CHARGE CONFERENCE . . . . . . . . . . .129
CLOSING ARGUMENTS . . . . . . . . . . . . . . .139
JURY CHARGE . . . . . . . . . . . . . . . . . .146
VERDICT . . . . . . . . . . . . . . . . . . . .155
SENTENCING . . . . . . . . . . . . . . . . . .158

3

1    instrument to identify who might have been in a

2    place where a crime is committed.

3        What you're going to hear from the expert

4    witness, a doctor with forensic science -- I'm not

5    sure he's a doctor.  He's going to testify and tell

6    you some history about DNA, what it is and how it

7    works and what he did to match up blood that was on

8    the shoe of Marcus Russaw, matches the blood of

9    Elmer Jackson.

10       Ladies and gentlemen, that is the evidence that

11    shows that Marcus Russaw was in the house of Elmer

12    Jackson and committed the crime against her.  He had

13    blood on his shoes, and that is the evidence that

14    puts him at the crime scene where Elmer Jackson

15    bled extensively.  You'll see pictures and other

16    things that led up to that.  I'm telling you now in

17    opening statements that what puts him there is the

18    DNA evidence.  And I ask you to listen closely to

19    what the forensic science says and all of the

20    evidence that leads up to this occurrence.

21       Thank you so much for your attention.  I don't

22    expect the case will last more than a day, and we

23    will try to have it to you while it's all still

24    fresh on your mind.  Thank you.

25       THE COURT:  Opening from the defense.

1      present:)

2      THE COURT:  Out of the jury's presence, the DA

3      has brought in a box from the State versus Russaw

4      case where the victim was Richard Ledbetter.  It's

5      the same evidence that was taken in that case.

6      Part of that evidence is intended to be introduced

7      in this trial; that being the tennis shoes that are

8      in a bag entitled Number 18, Item 18 listed as the

9      murder Barbour County, recovered DNA in county

10     jail, suspect Marcus Russaw, black male, 9/28/81,

11     one pair of black socks, one pair of tennis shoes.

12     It's the DA's intention to introduce the tennis

13     shoes because the blood on the tennis shoes, the DA

14     contends, relate to this case.  But to keep the

15     jury from knowing about the Ledbetter situation

16     and the other charges that are pending against Mr.

17     Russaw, I'm going to allow the DA to open Item

18     Number 18, withdraw the tennis shoes, rebag them in

19     a separate bag for purposes of this trial.

20     Any objection from the defense?

21     MR. BRUNSON:  I'm trying to see whose names are

22     on the seal, Judge.

23     THE COURT:  I see RA, which would be Ricky

24     Agerton.  And then the red tape from the Alabama

25     Department of Forensic Sciences.

5

1    THE COURT:  Well, I've already heard him say he

2    thought he was under arrest.

3    MR. BRUNSON:  I don't want him to say what he

4    thinks.  I want him to say what he knows, Judge.

5    THE COURT:  Do y'all contend he was under

6    arrest?

7    MR. WHIGHAM:  Judge, I thought he was under

8    arrest.  You know, it doesn't make any difference

9    whether he was under arrest or a material witness.

10   MR. BRUNSON:  I got to go across to get the

11   thing that says he was arrested on the 10th.

12   THE COURT:  Carmella, you're handling the other

13   case.

14   MRS. PENN:  Yes, Your Honor.  And they want him

15   because he was a material witness.  They want him

16   for questioning.  And he himself stated he was on

17   his way to the police department because they did

18   want him for questioning.  When they stopped him

19   and asked him was that his jacket in the backseat,

20   he said yes.  They picked the jacket up and it felt

21   heavy, and they felt it.  I think that was their

22   testimony for protection.  It appeared to be a gun.

23   At that time, they were arresting him for an

24   ex-felon in possession.  So the arrest came after

25   they took the jacket out of the car.

6

1       THE COURT:  They took his tennis shoes?

2       MRS. PENN:  When they took him down, then they

3   took -- After they questioned him, they took his

4   clothes.  So I believe they were probably arresting

5   him at that point for the capital murder when they

6   took his clothes.

7       MR. AGERTON:  He was being booked into the

8   Barbour County Jail when I took his clothes from

9   him.

10      MR. BRUNSON:  For a violent felon in possession

11  of a pistol.  The record indicates that he was not

12  arrested until the 10th on the capital case.  The

13  shoes are evidence in the capital case.  They're

14  not evidence in a case where there's a gun involved

15  because they didn't have nothing to do with that.

16      THE COURT:  I don't see why it's such a big

17  issue.

18      MR. BRUNSON:  Why what's a big issue, Judge?

19      THE COURT:  When he was arrested and whether he

20  was under arrest.  I mean, the shoes are coming in.

21      MR. BRUNSON:  I'm not objecting to the shoes

22  coming in, if they can meet their burden.  What I'm

23  objecting to is saying that he was under arrest

24  for capital murder, which is not a statement of

25  fact.

7

1    THE COURT:  I think everybody is in agreement

2    with that.

3    MR. AGERTON:  That can be true.  I can't

4    remember exactly because that was a long, drawn out

5    story where I was in the hospital the next day.  I

6    was out of work for almost thirty days.

7    THE COURT:  I want it characterized for this

8    jury for the purposes of this trial in such a

9    way -- You know, if you want to call it he was

10   detained, under arrest --

11   MR. BRUNSON:  I would like to say he was

12   detained for questioning.

13   MR. AGERTON:  How about during an investigation

14   of another case?

15   THE COURT:  That's how I suggested yesterday.

16   MR. BRUNSON:  As long as we don't elaborate on

17   what it was.

18   THE COURT:  Let me ask you this:  Did you see

19   the blood on his shoes?  Is that the reason you

20   took his shoes, or did you just take all his

21   clothes in the normal course of that investigation?

22   MR. AGERTON:  At some point in time, he told me

23   that these were the clothes he was wearing Sunday

24   night and Monday morning, which was the time of the

25   Ledbetter thing.  So naturally, we just --

1    investigative policy routine for DNA evidence is we

2    take it.  Well, while we were -- At some point in

3    time -- I can't -- I think it was at the jail.

4    He told me there was blood on these shoes.

5        MR. BRUNSON:  Judge, they did not do DNA on

6    these shoes for almost two years.  They did DNA

7    because I filed a motion to get the shoes to do the

8    test.  And then they realized there was blood on

9    the shoes.

10        THE COURT:  Are you saying they didn't know

11    there was blood on the shoes until you told them?

12        MR. BRUNSON:  I was the one that filed a

13    motion to ask that they be ordered to turn the

14    shoes over to me so the DNA testing could be done.

15    I also asked for money to do the DNA testing.

16        You denied both motions.  You ordered them to

17    send the shoes up to the forensic lab and have the

18    DNA testing done.

19        THE COURT:  I think that's accurate.  Now,

20    whether or not you already knew there was blood on

21    the shoes or not --

22        MR. BRUNSON:  I don't know.  I'd have to guess

23    that they didn't, you know.

24        THE COURT:  What about it, Ricky?  Do you know?

25    Do you remember?

9

1    MR. WHIGHAM:  We didn't have the shoes tested

2    for blood because we did want to delay the

3    Ledbetter trial into January.  And that's when Paul

4    raised the issue that he wanted them tested, and

5    that's when we ordered them tested.  That was how

6    it came about that they be tested.

7    THE COURT:  Do you intend to offer that

8    sequence of events as part of his defense?

9    MR. BRUNSON:  In this -- What case, Judge?

10   THE COURT:  In this one right now, today, the

11   one the jury is over there waiting on us to finish

12   this up.

13   Do you intend on offering the sequence of

14   events that you brought up the testing issue in

15   this case?

16   MR. BRUNSON:  Not really.  The only thing that

17   I have is that there was a large amount of time

18   between when this incident allegedly occurred and

19   shortly after when the shoes were in the

20   possession.  And then it was almost two years

21   before they chose to have them tested, and they

22   didn't really choose to have them tested.

23   THE COURT:  That brings the time issue up.

24   Now, I want to give you an opportunity to explain

25   the time issue without going into he's also charged

10

1     with capital murder.

2         How do you suggest doing that, Mr. DA?

3         MR. WHIGHAM:  Judge, if they make the time an

4     issue, I think I've got a right to talk about his

5     other charges.

6         MR. BRUNSON:  I disagree with that.  And here's

7     my reason:  My reason for entering the time issue

8     is that that was two years during which these shoes

9     could have been contaminated.  And that's -- I have

10    a right to bring up reasonable doubt.

11        THE COURT:  I think you do.  I also think I

12    have an obligation to let the state put forth to

13    the jury why there is that delay, why there is a

14    time period where --

15        MR. BRUNSON:  What's the answer going to be?

16    I'm the one that caused the DNA to be done, not the

17    state.  They can't take credit for that.

18        THE COURT:  I think Agent Agerton can say we

19    took his clothes in the investigation -- in the

20    normal course of investigation of another charge

21    and those were logged into evidence and put in the

22    box.  The issue of blood being on the shoes came up

23    in the prosecution of this other case, without

24    telling what it is, and that at that time they were

25    sent off for testing; and they came back with what

1 1

1    the DA says they came back as a match.

2         Why do we have to tell them anything about the

3    capital murder?

4         MR. WHIGHAM:  We don't, Judge, as long as it

5    has that explanation.

6         MR. BRUNSON:  We can't tell them that the DNA

7    testing was done at the request of the defense?  I

8    mean, I think that goes to the credibility of the

9    defendant.  And that's the truth.

10        MR. WHIGHAM:  It might be ineffective

11   assistance of counsel, too.

12        MR. BRUNSON:  Mr. Whigham on the Record said, I

13   don't have any reason to have the DNA testing on

14   those shoes.  And I filed a motion asking that we

15   be allowed to take the shoes and test them.

16        THE COURT:  And then I think if you get to do

17   that, I think the DA would be able to counter by

18   saying, we felt like and still don't feel like

19   those shoes had anything to do with that other

20   case; it turns out they have a lot to do in this

21   one.

22        Is that fair enough?

23        MR. BRUNSON:  Fair enough.

24        MR. ROBERTSON:  Your Honor, may I say

25   something?

12

```
 1   Q.   Yes, sir.

 2   A.   On this date, our laboratory received -- You want

 3        me to go through the inventory basically?

 4   Q.   If you just focus on just the pair of shoes that's

 5        marked as Exhibit Number 17, I think we can move

 6        it easier.

 7   A.   Okay.  On that date, we received one sealed brown

 8        paper bag which contained the following

 9        evidence -- it was identified to be from Marcus

10        Antwan Russaw.  That brown paper bag contained one

11        left shoe, one right shoe, and two socks.

12   Q.   I want to show you this bag just so you will have

13        seen it.  We have already opened it and taken the

14        shoe out of it.  I'd ask you to look at that, and

15        does that contain the records that correspond with

16        your lab records?

17   A.   Yes, it does.

18   Q.   And we're not marking that as an exhibit, but the

19        shoes that are just behind you are marked State's

20        Exhibit Number 17.

21             I also want to show you what's been marked

22        State's Exhibit Number 23.  Let me show you what's

23        been marked State's Exhibit Number 23 and ask you

24        to identify it and how it relates to your testing

25        of Marcus Russaw's shoes.
```

13

A.    When an item is submitted to our department, we
      give it what's called a unique identifier.  That's
      how I'm able to determine one item from another.  A
      unique identifier is going to be a series of
      numbers that tell me what item I'm dealing with.
      And in this case, we're dealing with Item 9, which
      was a brown paper bag which contained the shoes and
      the socks.

          The shoes, for example, would be 9-A-1.  And
      this would be 9-A-2.  And when we perform the DNA
      procedures, we're dealing with tiny tubes that are
      going to contain the DNA molecule in it.  Obviously
      we can't stick a shoe in a tube.  So what we have
      to do is if there's biological stains present, we
      have to swab those stains off -- just a cotton
      swab -- and submit that to DNA analysis.  The shoes
      will be placed back in the packet.  This evidence
      right here would be the swabs that were collected
      from the shoes.

          MR. WHIGHAM:  I'd like to offer State's Exhibit
      Number 23.

          MR. BRUNSON:  I only want to put on the Record
      which shoe -- the left shoe is 9-A-1 and the right
      shoe is 9-A-2.  Is that correct?

          THE COURT:  Can you figure out which one was

14

```
 1         9-A-1?

 2              THE WITNESS:  Yes, Your Honor.  I have in my

 3         report that 9-A-1 was the left shoe and 9-A-2 being

 4         the right.

 5    Q.   And, Mr. Macchia, as you did your analysis, what

 6         were you able to determine about the blood stains

 7         that were on the shoes?

 8    A.   Are you referring to the conclusions reached in

 9         this report?

10    Q.   What I want to ask you about is as it relates to

11         Mrs. Jackson.  That's the part I want the questions

12         to be guided to is the testing that you did on the

13         blood samples as it relates to Jackson.

14    A.   Well, what we do is we're generally going to be

15         dealing with a couple of samples.  One will be a

16         standard; in other words, a known standard came

17         from a known source where that could be the victim

18         or the suspect.  Okay?  And then that sample will

19         be compared to the unknown, which would in this

20         case be the stain generated from the shoe.

21              So we're going to look at the two different DNA

22         profiles and see do they match or is it excluded.

23         That's our goal.  So in this case, the stain from

24         the shoe -- which in this case is Item 9-A-2 --

25         that cotton swab that was swabbed from that shoe is
```

15

1   A.   Okay.  When the evidence is initially submitted,

2        it's -- When we get to that case, we open the

3        package.  And the screening involves just in a

4        nutshell looking for biological material -- saliva,

5        blood, or any other biological fluid can be

6        present.  So once that's determined, we cut out the

7        stain or we make a swab of the stain and put it in

8        an envelope and send that over to the DNA section

9        where those swabs are stored in another secure

10       container.  And that will be gotten to at a later

11       date.  The original evidence -- the comforter, the

12       pillows, the shoes, what have you -- that's all put

13       in its original container and that evidence is put

14       into a secure location a well.

15  Q.   Okay.  I want to ask you a specific question about

16       your screening in July.

17            You have two shoes, 9-A-1 which is the left

18       shoe and 9-A-2, which is the right shoe.  Please

19       describe to the best of your ability to the ladies

20       and gentlemen of the jury how much biological

21       material you observed on 9-A-2.

22  A.   Well, what was noted was a reddish brown stain.

23  Q.   A reddish brown stain?

24  A.   Reddish brown stain.

25  Q.   Can you be a little bit more specific?

16

```
 1   A.   Are you referring to the size of the stain or the

 2        concentration?

 3   Q.   This is what I'm trying to find out, Mr. Macchia --

 4             MR. WHIGHAM:  Your Honor, we object to him

 5        arguing with the witness.  Ask questions and not

 6        argue.

 7             MR. BRUNSON:  Well, I'm not arguing, Judge.

 8        I'm trying to find out if the shoe looked like it

 9        had been dipped in red paint or if there were one

10        or two drops on it.  That's what I'm trying to

11        find out.  And he's the one that's dancing all

12        around.

13             THE COURT:  Sounds like a good question.

14             MR. BRUNSON:  Ask the question.

15             THE COURT:  Was it dipped in red paint or was

16        it --

17             THE WITNESS:  I'm sorry.  I wasn't -- I was

18        unclear.  I apologize.

19   A.   I said there was a reddish brown stain.  It was

20        small.  It was light.  Okay?  I should say stains.

21   Q.   All right.  Can you describe the approximate size

22        of this stain?  Was it the size of a quarter, half

23        dollar, a penny, a dime, a drop of water?  How big

24        was it?

25   A.   I can only say that it was a very small stain.  I
```

17

1     can't give you an exact coin size.

2    Q.  Okay.  Would you agree with me there was no stains

3    on 9-A-1, the left shoe?

4    A.  There were stains, but they were not proven to be

5    biological stains.

6    Q.  Okay.  Now, so your comment is a small -- very

7    small stain on the right shoe and none on the left

8    shoe of biological nature?

9    A.  Yes, sir.

10   Q.  All right.  Now, did you test this stain to

11   determine if it was Caucasian blood or if it was

12   African-American blood?

13   A.  That's not possible to do that sort of test.

14   Q.  You don't know whether the donor was a white person

15   or an African-American person; is that correct?

16   A.  That's absolutely correct.

17   Q.  All right.  Now, so you do the screening.  That's

18   basically making the swab.

19       And what did you do with the swabs in July of

20   2002?

21   A.  After the swabs are prepared from the shoe, they're

22   packaged in a sealed package.  And those are

23   transferred to another storage location.  We have

24   these storage containers in our DNA section.

25   Q.  Who did you give them to, sir?

18

```
 1   A.   Yes, sir.

 2   Q.   All right.  And your initials are down on the

 3        bottom?

 4   A.   Yes, sir.

 5   Q.   All right.  And who else's initials are on there?

 6   A.   The initials are BKW.  That would be Brian Wilson.

 7   Q.   Thank you.

 8             THE COURT:  Has 23 been offered?

 9             MR. WHIGHAM: Yes, sir.

10             THE COURT:  It's admitted.

11             (State's Exhibit Number 23 was marked for

12             identification, offered, and received into

13             evidence.)

14             MR. BRUNSON:  That's all I have at this time,

15        Your Honor.

16             THE COURT:  Redirect.

17                     REDIRECT EXAMINATION

18   BY MR. WHIGHAM:

19   Q.   The questions in regard to the amount of stain, it

20        was enough for a sample, wasn't it?

21   A.   It was enough for a DNA profile, yes, sir.

22   Q.   And as it relates to the time of receiving these,

23        had you done a prior test on the blood sample on

24        these shoes?

25   A.   A prior test before doing DNA?
```

19

1    THE COURT: Anything else?

2    MR. WHIGHAM: One question.

    FURTHER REDIRECT EXAMINATION

BY MR. WHIGHAM:

Q.   The blood that was on that shoe is Elmer Jackson's

     blood, isn't it, within odds of more than a

     million to one?

A.   The DNA profiles match that of the standard that's

     identified to be from Elmer Jackson.

    FURTHER RECROSS-EXAMINATION

BY MR. BRUNSON:

Q.   And the amount of blood was one small drop; isn't

     that correct, sir?

A.   It was a small -- It was small stains.

    MR. BRUNSON: Thank you.

    (The witness was excused from the stand.)

    THE COURT: Next witness.

    MR. WHIGHAM: Judy Ketchum.

    **JUDY KETCHUM**

    was sworn and testified as follows:

    DIRECT EXAMINATION

BY MR. WHIGHAM:

Q.   Please state your job.

A.   I'm a court specialist with the circuit clerk's

     office.

20

1    I think you've got to show that somebody went in

2    that house.

3         And to say that because he had one drop of

4    blood -- if you take the state's evidence in best

5    light.  One drop of blood on a shoe that was found

6    almost a week later from him, and to say he went in

7    the house without any other evidence, Judge, is

8    just -- does not meet the burden of the prima facie

9    case.

10        THE COURT:  Response from the state.

11        MR. WHIGHAM:  Judge, the state has shown the

12   pictures of the ransacked of the house, tore an

13   inside door off the hinges, numerous pictures of

14   how the house was ransacked as well as the -- which

15   goes to the theft or intent to steal.

16        And the blood drop is exactly what puts Marcus

17   Russaw in the house.  Without the blood drop, we

18   wouldn't be in the courtroom today.  Blood is all

19   over the clothing, all over the walls, all over the

20   floor.  Even still on the pillows after she's been

21   transferred to Dothan and been in the hospital in

22   Dothan.  Blood on clothes hanging in the closet,

23   clothes hanging over the doorknobs.

24        There's more than sufficient evidence for the

25   jury to determine that the house was ransacked and

21

1    blood was over all the different things in the

2    house.  And Marcus Russaw had her blood on his

3    shoe.

4        MR. BRUNSON:  Judge, Mr. Whigham is correct.

5    There was blood everywhere.  How could a reasonable

6    person think that Marcus is involved when there was

7    one tiny drop on one of his shoes?  They don't have

8    any clothes with blood all over it.  They have one

9    shoe that has one tiny drop.

10       You know, Judge, that's just too much of a

11   stretch.

12       THE COURT:  Anything else?

13       MR. BRUNSON:  Yes, sir.  Hang on just a second,

14   please.

15       Judge, Mr. Whigham -- I cannot let this go.  He

16   said there was evidence of a theft.  Judge, no one

17   has come on this witness stand and even implied

18   that there was a theft.  If there was a theft,

19   Judge, then we ought to be talking about

20   manslaughter or attempted manslaughter and not

21   murder.  He has said from the get-go by all of his

22   presentation and everything that the purpose to go

23   into this house was to kill this lady.  And he

24   can't have it both ways, Judge.  At least the

25   defendant doesn't think so.  Thank you.

22

I'm sorry we had to stop and start so many times. It's a very important case, very important case for you to hear -- the jury of Barbour County that one of our citizens' house burglarized and they were beaten. I'm not going to talk to you much about what the different witnesses said. It's still fresh on your mind. We didn't have that many witnesses.

What we did have is DNA evidence. What I'd like for you to ask yourself is: Is there any other explanation for Mrs. Jackson's blood being on Marcus Russaw's shoe other than him having gone in the house, burglarized it, and beat her almost to death? And I ask you to ask yourself that question. Is there any other explanation of that blood? It was almost like if she hadn't lived, she would have been reaching back to tell you who beat her, who burglarized her house. Because Marcus Russaw had her blood on his shoes with no other explanation for it.

You heard Pete Macchia, who is the expert on DNA, talk to you and give you a full background on how DNA works. Of course, we've heard a lot on TV. It's a lot more common knowledge of what DNA does now. It's used in child support court and it's

23

used in all different kinds -- It's an accepted method just like many years ago fingerprints, which are still good evidence, is accepted. But this biological evidence is so specific and it so narrows down to being just one person in over a million in this particular case.

Ladies and gentlemen, you had an opportunity to have listened to this evidence and move our cases forward into the DNA evidence age. This isn't somebody saying, I saw Marcus Russaw go in the house. You don't have that. It's not eyewitness evidence. What we have is Mrs. Jackson's blood on Marcus Russaw's shoe. And there's no other explanation for it. No other explanation for his blood being on that shoe. It wouldn't have to be much, just enough for them to take a swab and match it to Mrs. Jackson.

You've got a lot of evidence here, and I'm not going to go over all of it. All this goes to the jury room with you. All the pictures that we saw where you could see how she was beat about the head mostly, and you can see her in the hospital. It's a wonder she survived. The charge is attempted murder because of this unmerciful beating of an 81-year-old mother by Marcus Russaw. He didn't

24

beat up some big old 25-year-old man.  Beat up an

old woman.  But she got him.  She got him because

she put the blood on his shoe.

Ladies and gentlemen, that's the evidence that

tells you who committed this crime.  You look back

through all these pictures and see how she was

beat.  The hospital records -- Look in the hospital

records to the care she got in the hospital.  I

took them out of the envelope so you can read them

and read what the doctors and what the nurses said

about her condition and all the treatment and all

the stitches and all that she went through.  You

can read all of that.  And that's what you'll do in

the jury room.

You can see the blood all over the house.  You

can see the blood.  There was probably more blood

than that one drop.  But praise the Lord that one

drop of it survived.  All of the evidence about how

the evidence was gathered was done thoroughly.  All

the officers did a good job of collecting what

evidence was available, taking the pictures.  Her

family took pictures of her in the hospital so you

would be able to see them.

Ladies and gentlemen, this is a very important

case because of scientific evidence.  It's a very

25

1  important case to the community. You heard the

2  different witnesses tell you what they observed

3  that morning and you saw the pictures.

4  I'm going to have one more opportunity to talk

5  to you, and I just want to thank you for being

6  here. I know you paid close attention. I know you

7  know the importance of an 81-year-old woman in a

8  house by herself getting beat like Mrs. Jackson

9  did. Thank you.

10  THE COURT: For the defense.

11  MR. BRUNSON: May it please the Court and Mr.

12  Whigham. Ladies and gentlemen, I'm going to be

13  very brief.

14  Like the judge told you to begin with, things

15  that I say and things that Mr. Whigham said are not

16  evidence. The only evidence came to you from the

17  witness stand.

18  Let's talk about a couple of those things. Mr.

19  Whigham described to you and witnesses described to

20  you this scene, blood everywhere. Is it reasonable

21  that one single, small drop of blood gets on the

22  perpetrator's shoes? You don't have to worry about

23  where that drop of blood came from. But is it

24  reasonable that one small drop of blood gets on

25  this man's shoe? And like he said, there are no

26

other witnesses.  There's nobody that can say that

Marcus Russaw or anybody did this.

One small drop of blood.  How did it get there?

You listened to the testimony.  It could very

easily have gotten there from cross-contamination.

There were a number of ways it could have gotten

there.  But the most important thing was when Ricky

Agerton got up and said, I can't really tell you

whether these are the shoes.  And he read the size

of the shoes, 9 and a half.  And then the

defendant's shoes are 10 and a half.  He read that.

You'll have to ask yourself is that reasonable.

These shoes have been in the possession of the

Alabama Department of Forensic Sciences or the

police since October of 2001, until today.  Close

to two years.  My one main comment to you is:

Ladies and gentlemen, the shoe doesn't fit.  Thank

you.

THE COURT:  Final argument from the state.

MR. WHIGHAM:  If it please the Court.  When you

take out these pictures and look at them and look

at the hospital records, think about Mrs. Elmer

Jackson went through that night.  Think of any

other explanation for blood being on Marcus' shoes

other than him being there to commit the crime.

27

1    other witnesses.  There's nobody that can say that

2    Marcus Russaw or anybody did this.

3         One small drop of blood.  How did it get there?

4    You listened to the testimony.  It could very

5    easily have gotten there from cross-contamination.

6    There were a number of ways it could have gotten

7    there.  But the most important thing was when Ricky

8    Agerton got up and said, I can't really tell you

9    whether these are the shoes.  And he read the size

10   of the shoes, 9 and a half.  And then the

11   defendant's shoes are 10 and a half.  He read that.

12        You'll have to ask yourself is that reasonable.

13   These shoes have been in the possession of the

14   Alabama Department of Forensic Sciences or the

15   police since October of 2001, until today.  Close

16   to two years.  My one main comment to you is:

17   Ladies and gentlemen, the shoe doesn't fit.  Thank

18   you.

19        THE COURT:  Final argument from the state.

20        MR. WHIGHAM:  If it please the Court.  When you

21   take out these pictures and look at them and look

22   at the hospital records, think about Mrs. Elmer

23   Jackson went through that night.  Think of any

24   other explanation for blood being on Marcus' shoes

25   other than him being there to commit the crime.

28